IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| RANDALL GAMMETT a/k/a JENNIFFER ANN SPENCER, | ) ) ) | Case No. CV05-257-S-MHW |
| | ) | **MEMORANDUM DECISION** |
| Plaintiff, | ) | **AND ORDER** |
| | ) | |
| vs. | ) | |
| | ) | |
| IDAHO STATE BOARD OF CORRECTIONS, et al., | ) ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Pending before the Court is Plaintiff's Motion for Preliminary Injunction (Docket No. 134). The Court held a hearing on the Motion for Preliminary Injunction on July 11, 2007. The parties stipulated that the evidence to be presented at the hearing will be limited to the affidavits, declarations, and reports filed in support of or in opposition to the original Motion for Preliminary Injunction, including any supplemental medical records or prison documents submitted by July 5, 2007. *See Parties' Stipulation* (Docket No. 212).

Having considered the oral arguments of the parties, and having reviewed the record and the parties' extensive submissions supporting and opposing the motion, the Court enters the following Order granting Plaintiff's Motion for a Preliminary Injunction.

MEMORANDUM DECISION AND ORDER 1

## DEFENDANTS' EXPEDITED MOTION TO AUGMENT
## RECORD RE: PRELIMINARY INJUNCTION

On July 20, 2007, Defendants filed an Expedited Motion to Augment Record re: Preliminary Injunction Motion (Docket No. 227). Defendants stipulated with Plaintiff that the record before the Court would be limited to those items presented to the Court by July 5, 2007. Because Defendants have not obtained the stipulation of Plaintiff to augment the record, the Motion is denied.

Defendants argue that they wish to proffer the deposition of Plaintiff's past friends and acquaintances to impeach Plaintiff's testimony that he dressed or lived as a woman prior to incarceration and that he received and ingested birth control pills for three weeks prior to his incarceration. While such laywitness testimony might call into question some of the basis for Plaintiff's experts' opinions, when placed in the balance against the other evidence Plaintiff has presented, it is not enough to tip the scale in Defendants' favor in terms of the narrow issues in the Preliminary Injunction Motion.

## MOTION FOR PRELIMINARY INJUNCTION

### A.    Plaintiff's Request

Plaintiff is an inmate incarcerated in the psychiatric treatment unit of the Idaho Maximum Security Institution (IMSI), under the care and custody of the Idaho Department of Correction (IDOC).[1] Plaintiff alleges that he suffers from Gender Identity

---

[1] Plaintiff was granted a legal name change after filing this lawsuit. Plaintiff is now known as Jenniffer Ann Spencer. Plaintiff's counsel use the feminine pronoun throughout their court documents, and Defendants' counsel use the male pronoun. The Court previously gave

MEMORANDUM DECISION AND ORDER 2

Disorder (GID), which is a type of mental disorder identified in the *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition* (DSM-IV).[2]  Defendants disagree, having diagnosed Plaintiff at different times with mental conditions ranging from "sexual disorder not otherwise specified," bipolar disorder, antisocial personality disorder, and/or attention deficit disorder with hyperactivity (ADHD).  During his incarceration, Plaintiff has made approximately seventy-five (75) requests for treatment for GID.  Based on their original diagnosis and their continued care and treatment of Plaintiff, IDOC and CMS staff have refused to provide treatment for GID.  Plaintiff attempted suicide in August 2004, when he learned that prison doctors did not believe he had GID.  Over one year later, on October 19, 2005, Plaintiff performed a self-castration.

Plaintiff alleges that there are immediate physical and mental health risks associated with untreated GID and hypogonadism (a lack of hormones caused by the absence of his testicles) that warrant issuance of a preliminary injunction.  In Plaintiff's Motion for Preliminary Injunction, he requests that the Court issue an order requiring Defendants to provide (1) hormone treatment of the type and dosage range recommended by Dr. Denise Taylor and Dr. George Brown, and (2) psychotherapeutic counseling as recommended by Dr. Taylor and Dr. Brown and as required by the IDOC's directives for

---

notice of its intent to refer to Plaintiff without the use of a pronoun, but it has elected to use the male pronoun for ease of discussion, and not as a reflection of the Court's view of the merits of Plaintiff's claims.

[2]  The DSM-IV is the standard manual of psychiatric diagnoses published by the American Psychiatric Association.  *See Affidavit of Parisa Jorjani*, Exhibit Y (Docket No. 135-4).

diagnosis and treatment of inmates with GID.  Plaintiff has submitted the medical report

of psychiatrist George Brown, a leading expert in GID diagnosis and treatment in

correctional settings, who has opined that Plaintiff "continues to be misdiagnosed and

untreated in the face of overwhelming evidence of GID as a primary diagnosis."  *See*

*Affidavit of Parisa Jorjani,* Exhibit D, Report of Dr. George Brown (Docket No. 136).

Plaintiff's request for an injunction focuses narrowly on current treatment for GID

and hypogonadism, and therefore, it is directed at only those Defendants responsible for

providing current medical treatment to Plaintiff.

## B.      Standard of Law

A Rule 65 preliminary injunction may be granted if the moving party satisfies one

of two tests, designated as the "traditional standard" or the "alternative standard"of law.

*International Jensen, Inc. v. Metrosound U.S.A., Inc*., 4 F.3d 819, 822 (9th Cir. 1993);

Fed. R. Civ. P. 65.  The traditional standard requires a demonstration of the following

elements: (1) that the moving party will suffer irreparable injury if the relief is denied; (2)

that the moving party will probably prevail on the merits; (3) that the balance of potential

harm favors the moving party; and (4) that the public interest favors granting relief.

*Cassim v. Bowen*, 824 F.2d 791, 795 (9th Cir. 1987).  Under the alternative standard, "the

moving party may meet its burden by demonstrating *either*: (1) a combination of probable

success on the merits and the possibility of irreparable injury if relief is not granted,[3] or

---

[3]An irreparable injury is defined as an actual and concrete harm, or the imminent threat of
an actual and concrete harm.  *Los Angeles Memorial Coliseum Commission v. National Football
League*, 634 F.2d 1197, 1200 (9th Cir. 1980).  A threat of harm is not "imminent," if it is based

(2) the existence of serious questions going to the merits and that the balance of hardships tips sharply in [the moving party's] favor." *International Jensen*, 4 F.3d at 822 (emphasis in original).  "Essentially, the trial court must balance the equities in the exercise of its discretion."  *Id*.

Because the physical well-being and mental health of the Plaintiff are at issue in the Motion, the Court finds that the alternative standard is more appropriate than the traditional standard.  In *Benda v. Grand Lodge of Int'l Ass'n of Machinists* & Aerospace Workers, 584 F.2d 308 (9th Cir. 1978), the Court more fully explained how to apply the alternative standard:

> Recent cases have made it clear . . . that there are not really two entirely separate tests, but that they are merely extremes of a single continuum. *Fox Valley Harvestore v. A. O. Smith Harvestore Products, Inc.*, 545 F.2d 1096 (7th Cir. 1976). The critical element in determining the test to be applied is the relative hardship to the parties. If the balance of harm tips decidedly toward the plaintiff, then the plaintiff need not show as robust a likelihood of success on the merits as when the balance tips less decidedly. *Aguirre v. Chula Vista Sanitary Service and Sani-Tainer, Inc.*, 542 F.2d 779 (9th Cir. 1976). No chance of success at all, however, will not suffice. The irreducible minimum has been described by one court as a fair chance of success on the merits, *McCormick v. Claytor*, 441 F.Supp. 622 (D. Or. 1977), while another has said the questions must be serious enough to require litigation, *Aguirre, supra*. The difference between the two formulations is insignificant. Therefore, we accept either as satisfactory.

*Id*. at 315.[4]  Put an even simpler way, "'the greater the relative hardship to [the moving

---

upon remote possibilities or mere speculation.  *Caribbean Marine Services Co. v. Baldrige*, 844 F.2d 668, 675 (9th Cir. 1988).

    [4]  The *Benda* Court noted that the alternative standard first appeared in *William Inglis & Sons Baking Company v. ITT Continental Baking Company*, 526 F.2d 86, 88 (9th Cir. 1975). *See Benda*, 584 F.2d at 315.  The *Benda* Court noted that the alternate test has been approved

party], the less probability of success must be shown.'" *Warsoldier v. Woodford*, 418 F.3d 989, 994 (9th Cir. 2005) (quoting *Walczak v. EPL Prolong, Inc.*, 198 F.3d 725, 731 (9th Cir. 1999)).

The Ninth Circuit has made it clear that the "[t]he district court is not required to make any binding findings of fact; it need only find probabilities that the necessary facts can be proved." *Sierra On-Line, Inc., v. Phoenix Software, Inc.*, 739 F.2d 1415, 1423 (9th Cir. 1984).

## C.    Background

Gender Identity Disorder (GID), or transsexualism, is "[a] rare psychiatric disorder in which a person feels persistently uncomfortable about his or her anatomical sex, and who typically seeks medical treatment, including hormone therapy and surgery, to bring about a permanent sex change." *Farmer v. Brennan*, 511 U.S. 825, 829 (1994) (quoting American Medical Association, *Encyclopedia of Medicine* 1006 (1989)).  Courts have consistently considered Gender Identity Disorder (including transsexualism or transgenderism) to be a serious medical condition for purposes of the Eighth Amendment. *See Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000); *White v. Farrier*, 849 F.2d 322, 325 (8th Cir.1988); *Meriwether v. Faulkner*, 821 F.2d 408, 411-13 (7th Cir.), *cert. denied*, 484 U.S. 935 (1987); *Wolfe v. Horn*, 130 F. Supp. 2d 648, 652 (D.Pa. 2001); *Phillips v. Michigan Dept. of Corr.*, 731 F. Supp. 792 (D. Mich. 1990).

several times by the Ninth Circuit.  *See id. (citing Motor Vessels Theresa Ann v. Kreps*, 548 F.2d 1382 (9th Cir. 1977); *Richter v. Department of Alcoholic Beverage Control*, 559 F.2d 1168, 1173 (9th Cir. 1977)).

Hypogonadism is defined as "a reduced or absent secretion of hormones from the sex glands (gonads).  In men, these are the testes; in women, the ovaries." *Health Reference*, "hypogonadism," http://www.drkoop.com/ency/93/001195.html.  In adult males, hypogonadism can cause increase in body fat, decrease in muscle mass, and loss of bone mass or osteoporosis.  *Men's Health*, "male hypogonadism," http://www.mayclinic.com/health/male-hypogonadism/DS00300.  In addition, "[a]s testosterone decreases, some men may experience symptoms similar to those of menopause in women.  These may include, fatigue, difficulty concentrating, hot flashes, irritability, and depression." *Id.*

Plaintiff's current incarceration originated in July of 1999, when he was arrested for possession of a stolen vehicle.  Plaintiff admitted to police that he knew the vehicle in which he was riding was stolen.  *Affidavit of Parisa Jorjani*, Exhibit H (Docket No. 136).  Plaintiff was sentenced for evaluation at the Northern Idaho Correctional Institution in Cottonwood, Idaho. *Id.*, Exhibit H.  On May 25, 2000, Plaintiff escaped from the Cottonwood facility and was apprehended two days later in Lewiston, Idaho. *Id.*, Exhibit I.  As a result of the escape, Plaintiff was transferred to the Idaho State Correctional Institution at Orofino (ICI-O) to serve a nine-year sentence (six years for possession of stolen property and a three-year enhancement for escape). *Id.*, Exhibit J.  It was at ICI-O that Plaintiff first saw the notice about the newly-adopted Prison Directive on GID that had been posted at the prison. *Id.*, Exhibit D, p.7.  The notice was a requirement of the settlement terms of Idaho's first GID civil rights case, *Linda Patricia Thompson v. Dave*

*Paskett, et al.*, Case No. CV00-388-S-BLW.

　　1.　　Requests for GID Evaluation and Treatment

In September 2003, Plaintiff's observation of the notice on the new GID policy prompted him to submit a written health services request stating: "I feel that I have a Gender Identity Disorder. I Feel that I need to Become a Women [sic]. I want to becom [sic] a women! [sic]" *Jorjani Affidavit*, Exhibit K. In response, Defendant Titus, the Health Services Administrator at IMSI, conducted an interview with Plaintiff on September 30, 2007. Plaintiff asked a series of questions during the interview, and Titus informed Plaintiff that a treatment team was being developed for inmates with GID. She also told Plaintiff that she would keep him informed about the progress of the treatment team's formation. *Id.*, Exhibits EE & FF.[5]

On January 27, 2004, Plaintiff met with Dr. Fraun Flerchinger, Clinical Director at State Hospital North in Orofino, Idaho. *Affidavit of Fraun Flerchinger, M.D., Docket No. 162.* She is a contract provider for Prison Health Services, Inc., and she performed one brief screening examination with Plaintiff, apparently at the request of Defendant Titus. Dr. Flerchinger met with Plaintiff in response to his request that he be evaluated for GID. *Id.*, p. 2. Dr. Flerchinger characterized GID as a "rare disorder," observing that she had

---

　　　　[5] Plaintiff's list of questions provided to Defendant Titus included the following: (1) How is my body going to change, aside from my body growing breasts? (2) How long will I have to take treatment before I become a woman? (3) When I become a woman, will I be able to have children? (4) Will I have trouble adjusting to being a female? (5) Why is it that I already see myself as a female? (5) How do families of people take these transformations? *Jorjani Affidavit*, Exhibit FF (Docket No. 136).

MEMORANDUM DECISION AND ORDER 8

not encountered a patient with GID symptoms in her psychiatric practice.  *Id*.

Plaintiff told Dr. Flerchinger that he had requested evaluation for GID after he saw a memo regarding new IDOC Directives on treatment for GID.  The directives indicated that an inmate diagnosed with GID could potentially be considered for alternative housing within the IDOC facilities.  *Id*., p. 3.  During the brief screening visit, Plaintiff told Dr. Flerchinger that he was raised without a father figure and that he was treated like his sisters.  He indicated that as a child, he felt more normal dressing in girls' clothing, but as he grew older, he was less inclined to do so.  He denied wanting to dress like a woman at the present time, and admitted a sexual attraction to both men and women.  He said he felt more like a woman in his relationships.  Plaintiff also reported being sexually abused as a child.  *Id*., p. 3.

Plaintiff informed Dr. Flerchinger that he wanted to be in a special program for inmates with GID.  After the evaluation for GID, Dr. Flerchinger decided upon an "informal diagnosis" of a personality disorder, sexual identity confusion, and/or identity confusion.  *Id*., p. 2-3.  Dr. Flerchinger also indicated that Plaintiff may be hoping to obtain some type of secondary gain through requesting evaluation for GID.  She recommended that Plaintiff's sexual confusion and identity issues be monitored.  *Id*., p. 4.

In May of 2004, Plaintiff submitted a request asking about IDOC's GID Policy Directives, the composition of its Management and Treatment Committee (MTC), and the GID services available, stating "I feel at the End of my 'rope' so to speak. I don't know what to do. I don't like the way I feel! I hate my self.  I don't feel I'm being taken serious

MEMORANDUM DECISION AND ORDER 9

[sic] at all. All I want is help so that I don't have to feel the way I do." *Jorjani Affidavit*, Exhibit L.  Defendant Titus informed Plaintiff that there had been no recommendation in his case, and the MTC had not yet been picked.  Titus informed Plaintiff that GID was not a life threatening illness and that his health issues would be handled as soon as the MTC convened.  *Id.*

Six months after meeting with Dr. Flerchinger, Plaintiff was transported to Boise in July of 2004 to meet with Chad Sombke, Ph.D., Chief Psychologist at IMSI.  Plaintiff had continued to request evaluation for GID while at ICI-O, and Dr. Sombke met with Plaintiff in July "for the purpose of determining whether he met the diagnostic criteria as set forth in the Diagnostic and Statistical Manual-IV (DMS-IV) for GID."  *Affidavit of Chad Sombke*, *Ph.D.* (Docket No. 153).  The DSM-IV sets forth the following criteria for GID: (1) a strong and persistent cross-gender identification; (2) persistent discomfort with the individual's sense of inappropriateness in the gender role of that sex; (3) the disturbance is not concurrent with a physical intersex condition; and (4) the disturbance causes clinically significant distress or impairment in social, occupational, or other important areas of functioning.  *Id.*, p. 4.  Dr. Sombke states that "in adults, the disturbance is manifested by symptoms such as preoccupation with getting rid of primary and secondary sex characteristics (e.g., requests for hormones, surgery, or other procedures to physically alter sexual characteristics to simulate the other sex) or [a] belief that he or she was born the wrong sex."  *Id.*, p. 4.

Dr. Sombke recorded in his notes on July 19, 2004 that Plaintiff appeared to be

MEMORANDUM DECISION AND ORDER 10

more confused with his sexual orientation than "actually meeting the criteria for a GID

diagnosis." *Id*., p. 5.  Plaintiff also reported that he had experienced both heterosexual

and homosexual "social relationships, but feels more comfortable in a female role." *Id*.,

Exhibit B.

On July 20, 2004, Plaintiff was examined by Defendant Kenneth Khatain, M.D.,

Chief Psychiatrist for IDOC.  *Affidavit of Kenneth Khatain, M.D.* (Docket No. 155).

During the interview with Dr. Khatain, Plaintiff "stated that he is attracted to males and

feels that while having sex with males he is [in a] female role." *Id*., Exhibit B.  Plaintiff

also reportedly stated that "I feel like I am a woman trapped in a man's body," and that he

was looking forward to a time when "he may be able to have surgery/treatment/etc." *Id*.,

Exhibit B.  Dr. Khatain concluded it was "unclear if [Plaintiff] does or does not fulfill

criteria for a gender identity disorder," and diagnosed him as having "no other current

disorders." *Id.*, Exhibit B.  Dr. Khatain explained to Plaintiff that Dr. Sombke was

"considering some psychological tests to try to help with a diagnosis if in fact one exists,"

and that Dr. Khatain would consult with Dr. Sombke and make appropriate

recommendations after that testing.  *Id*., Exhibit B.

On July 21, 2004, Dr. Sombke performed additional testing and evaluation of

Plaintiff.  The evaluation included an interview to obtain Plaintiff's history and the

administration of the Personality Assessment Inventory (PAI).  *Sombke Affidavit*, ¶ 10

(Docket 153).  The evaluation states that "[Plaintiff] appears to be more confused over his

sexual orientation than his actual gender identity. . . He is very ambivalent about his

MEMORANDUM DECISION AND ORDER 11

desire to be a woman and about his belief that he was born a woman inside a male body." *Id*., Exhibit C.

Dr. Sombke's diagnosis after the psychological evaluation was "AXIS I: 302.9 Sexual Disorder Not Otherwise Specified." *Id*., Exhibit C.  He determined that Plaintiff was at a high risk of suicidal behaviors, and that he "may benefit from some education and/or counseling regarding his sexual orientation issues."  *Id*., Exhibit C.  On the bottom of the evaluation is the signature of Dr. Kenneth Khatain, the contract psychiatrist for IMSI, and the words "reviewed & concur [with] conclusion."  *Id*.  There is nothing in the record indicating that Plaintiff ever received education or counseling regarding his sexual orientation issues.

On August 10, 2004, Plaintiff submitted a request to Dr. Sombke, stating: "You said that you would talk to me. I would like to know what is going on with my case! I feel like I'm being ignored and I want to know why? I feel like maby [sic] I need to do something drastic to get your attention. Do I have to?" *Jorjani Affidavit*, Exhibit O.  Dr. Sombke orally informed Plaintiff the next day that he did not have GID.  *Id.*, Exhibit P. Three days later, Plaintiff attempted suicide by hanging.  *Id.*

On August 17, 2004, Dr. Khatain examined Plaintiff regarding the suicide attempt at the request of Dr. Sombke.  One month prior to the suicide attempt, Plaintiff's diagnosis was "no other current disorders," but Dr. Khatain concluded at this examination that Plaintiff suffered from bipolar disorder.  The notation on the "psychiatric consultant's notes" is "Bipolar disorder type one versus two?"  Apparently, the diagnosis was unclear

MEMORANDUM DECISION AND ORDER 12

as to the type of bipolar disorder Plaintiff had, and he was given a prescription for Lithium. *Khatain Affidavit*, Exhibit. C.  At a follow-up consultation on November 3, 2004, Dr. Khatain noted that Plaintiff "is no longer fixated on the gender issue." *Id.*, Exhibit D.

Following the suicide attempt, Plaintiff submitted twenty-one (21) written requests to know the reason behind Defendants' decision to exclude a GID diagnosis.  On August 22, 2004, Plaintiff submitted a request to Defendant Haas, the medical services manager, stating "I want to know why you are not following policiys [sic] concerning people who clame [sic] they have GID. [ ] The only person who can diagnose GID is a specialist. Why are you not following your procedures and policies?" *Jorjani Affidavit*, Exhibit R. Several months later, Plaintiff filed this lawsuit on June 30, 2005, alleging an Eighth Amendment deliberate indifference claim regarding GID treatment.

On October 9, 2005, Plaintiff attempted self-castration by making an incision in his scrotum with a razor blade.  Plaintiff stated he was depressed because he had not heard from his family.  He also stated that he was upset because he wanted to go to a Boise correctional facility due to his "transgender issues." *Id.*, Exhibit S.  Defendants responded by explaining that it was normal to be "depressed to a certain degree" around one's birthday and discussed Plaintiff's participation in education therapy groups. *Id.*, Exhibit T.  Ten days later, on October 19, 2005, Plaintiff completed the self-castration and flushed his testicles down the toilet. *Id.*, Exhibit. V.  Before the self-castration, he wrote a note stating: "I cut my genitals off do [sic] to the fact that I am a transgenderd

MEMORANDUM DECISION AND ORDER 13

[sic] individual and I could stand the sight of them no more. This is not a suicide attempt. This is simply a way for me to remmady [sic] my problem." *Id.*, Exhibit. U.  When asked by a member of the prison staff why he had gone through something so painful, Plaintiff responded that "it was much more painful to live as a transgender." *Id.*, Exhibit V.

There is nothing in the record to indicate that Plaintiff was re-evaluated for GID by any physician or mental health professional affiliated with IDOC after the self-castration, nor does it appear that he was provided with counseling focused on gender identity issues. There is nothing in the record showing that the IDOC policy relating to gender identity diagnosis and treatment was followed either prior to or after the self-castration.  Dr. Khatain states that "I thought my previous diagnosis of Bipolar Disorder was correct," *Dr. Khatain Affidavit*, p. 8, and makes no reference to Dr. Sombke's diagnosis of Sexual Disorder Not Otherwise Specified, with which he concurred, *Dr. Sombke Affidavit*, Exhibit C (Docket No. 153).  The chart notes for November 8, 2005 state that Plaintiff "made no discussion during the interview regarding issues of removing his testicles or any other sexual identity issues." *Id.*, Exhibit E.  There is nothing in the chart notes proffering a diagnostic or psychiatric explanation for the self-castration by Dr. Khatain or Dr. Sombke.  Both of these doctors left the prison at some point in time after this litigation was instigated and are not involved in Plaintiff's current care.

    2.    <u>Referral to Endocrinologist</u>

On March 3, 2006, nearly five months after the self-castration, Plaintiff  was seen by Dr. Richard Christensen, an endocrinologist, in connection with the lack of hormones

MEMORANDUM DECISION AND ORDER 14

caused by Plaintiff's removal of his testicles.  *Affidavit of Richard B. Christensen,* ¶¶ 3-4

(Docket No. 137).  Dr. Christensen diagnosed Plaintiff as suffering from hypogonadism

as a result of a hormone deficiency cause by the self-castration.  *Id.*, ¶ 5.  Plaintiff

informed Dr. Christensen that he was not interested in taking replacement testosterone,

but that he wanted to be placed on estrogen hormones.  *Id.*  Dr. Christensen states that

"[g]iven the patient's self-castration, he needs to be on some form of hormone

replacement to avoid and/or reverse the negative health effects of his hypogonadism."

*Id.*, ¶ 6.  Dr. Christensen's chart notes indicate that Plaintiff was informed of the health

risks associated with hypogonadism which include: "osteoporosis, muscle mass loss,

relative fat mass increase, and metabolic changes that may constitute an increased risk of

future CVD (although data on the latter is limited)."  *Id.*, Exhibit B (Docket No. 138).  Dr.

Christensen also noted that he could not make a recommendation as to whether Plaintiff

should pursue estrogen therapy "without a thorough psychological evaluation by someone

experienced in gender change."  *Id.*, Exhibit B, p. 3.

 Defendants have not offered any estrogen hormonal therapy to Plaintiff, but have

offered only testosterone replacement.  Plaintiff alleges that Dr. Sombke offered to make

a disciplinary offense report "go away" if he cooperated and took testosterone.  *Jorjani

Affidavit*, Exhibit A.  On September 19, 2006, in response to a request inquiring about

treatment for his GID condition, Dr. Green, Plaintiff's current CMS psychologist, advised

Plaintiff to "[p]lease continue with your art," referring to the art therapy program Plaintiff

was involved in.  *Id.*, Exhibit X.

MEMORANDUM DECISION AND ORDER 15

3.      Plaintiff's Deposition Testimony

At Plaintiff's deposition, he stated that from an early age he felt as though he had been born into the wrong body, and that he was a female trapped in a male's body. *Jorjani Affidavit*, Exhibit A, pp.  218:16 & 167:14-19; Exhibit B, p. 2; Exhibit D, p. 5. As a child, Plaintiff reported dressing in girls' clothing and feeling more comfortable than in boys' clothing.  *Id.*, Exhibit A, p. 323:23; Exhibit B, p. 2; Exhibit D, p. 5.   Plaintiff reported being consistently treated by his parents as a girl, and his father referring to him as "the little girl." *Id.*, Exhibit A, p. 33:15-17.  As a teenager, Plaintiff was hospitalized in 1994 for mutilation of his genitals.  *Id.*, Exhibit G (Intermountain Hospital records); Exhibit A, pp. 187:17 to 188:21.

As an adult, Plaintiff claims that he began dressing, living, and portraying himself as a woman full-time, and shared a home with a male partner.  *Id.*, Exhibit A, pp.127:15-128:1 & 219:20-24; Exhibit B, p. 2; Exhibit D, p. 5.  In June of 1999, he briefly took female hormones, in the form of birth control pills.  *Id.*, Exhibit A, pp. 133:25 to 135:14; Exhibit B, p. 2; Exhibit D, p. 6.  Plaintiff also reported applying for employment while dressed as a woman and indicated on an employment application that he was a female. *Id.*, Exhibit DD, p. 12.  After his incarceration at an IDOC facility in 2000, Plaintiff made efforts to dress and groom as a woman, including wearing skirts, shaving body hair, and using makeup.  *Id.*, Exhibit A, p. 312:13-20; Exhibit D, p. 6.

Plaintiff also disclosed the following at his deposition:

Q.      The fact that you aren't diagnosed right now, does that affect your

MEMORANDUM DECISION AND ORDER 16

interactions with other inmates here?

A.      It doesn't affect them, but it affects me.

Q.      And how so?

A.      Because I -- well, for starters, one thing that I'm not, one thing that I don't
tell the psychologists and psychiatrists is that -- well, for starters, I
contemplate suicide quite a bit.
I contemplate how I'm going to feel when I actually get a chance to get
treatment.  You know, how I feel, you know, every day, just stuff like that."

*Id*, p. 314:4-15.

4.      Opinions of Experts

Plaintiff retained George Brown, M.D., as a psychiatric expert, who has twenty

years of experience in diagnosing gender disorder issues.  Dr. Brown specializes in the

treatment of gender issues, using the Harry Benjamin International Gender Dysphoria

Association's Standards of Care for Gender Identity Disorders ("Harry Benjamin

Standards")  *Id.*, Exhibit D.  The Harry Benjamin Standards are described as a

professional consensus about the psychiatric, psychological, medical, and surgical

management of gender identity disorders.[6]  *See Jorjani Affidavit*, Exhibit Z, p.1.  The

IDOC refers to the Harry Benjamin Standards in its policy governing GID treatment,

_____

[6]  The Harry Benjamin Standards provide that after a diagnosis of GID is made by a
competent mental health professional, a therapeutic approach to treatment usually includes the
administration of hormones of the desired gender and real-life experience living in the desired
gender role.  *Jorjani Affidavit*, Exhibit Z, p.11-14.  Cross-sex hormonal treatments are often
medically necessary for patients suffering from GID.  *Id.*, p. 13.  Hormone treatment can
improve the quality of the patient's life, and limit the psychiatric co-morbidity (i.e., the
development of additional mental disorders) which can accompany lack of treatment.  *Id*.  In
some patients, hormonal therapy alone may provide sufficient symptomatic relief to individuals
with GID. *Id.*, p. 14.

MEMORANDUM DECISION AND ORDER 17

Directive No. 401.06.03.501.  *Id.*, Exhibit F at § 05.01.00.

 Dr. Brown has been a member of the Harry Benjamin International Gender Dysphoria Association since 1986 and has served on the Committee to Revise the Standards of Care (1990-98), the Standards of Care Revision Committee (member from 2001 to the present, Co-Chairman until 2005), and the Board of Directors (2001-2005). *Id.*  Dr. Brown has authored numerous publications on sexual and gender identity disorders, including the diagnosis and treatment of GID.  *Id.*

 On November 13, 2006, Dr. Brown interviewed and examined Plaintiff.  Based on the interview and examination, an extensive review of his prison and medical records, and the relevant literature, Dr. Brown concluded that (1) Plaintiff indisputably suffers from GID, *id.*, Exhibit D, p. 3; (2) Plaintiff has been misdiagnosed with bipolar disorder despite overwhelming evidence of GID as a primary diagnosis, *id.*, Exhibit D, p. 2-3; (3) Untreated GID in inmates can be a life-threatening condition because it potentially leads to suicidal behavior and near-lethal self-surgeries, *id.*, Exhibit D, p. 20; (4) Plaintiff continues to be both misdiagnosed and untreated for the GID condition, *id.*, Exhibit D, p. 21; and (5) Plaintiff has not received appropriate psychiatric or medical treatment for GID, *id.*, Exhibit D, p. 21.

 Dr. Brown further concluded that testosterone is contraindicated for Plaintiff's condition, and in fact is harmful because it "would lead to increased gender dysphoria, desperateness, depression and suicidality, with a high degree of medical certainty." *Id.*, Exhibit D, p. 22.  Dr. Brown recommended estrogen therapy "for both physical and

MEMORANDUM DECISION AND ORDER 18

mental health benefits." *Id.*, Exhibit D, p. 23.  Dr. Brown also opined that "in the absence

of a formal diagnosis of GID, the symptom complex of gender dysphoria should still be

addressed in any comprehensive treatment plan." *Id*., p. 8.

Dr. Brown's report concurs with the diagnosis of Dr. Denise Taylor, M.D., a

second expert retained by Plaintiff.  Dr. Taylor examined Plaintiff on April 11, 2006, and

also reviewed Plaintiff's prison and medical records.  Dr. Taylor has provided medical

care to approximately 150 inmates with GID and has consulted with numerous physicians

on the diagnosis and treatment of GID.  *Id.*, Exhibit B, p. 1. Dr. Taylor concluded that

Plaintiff  "definitely suffers from significant gender dysphoria and meets the criteria for

GID as defined by the DSM-IV," and Plaintiff "appears to meet the eligibility criteria and

the readiness criteria for hormone therapy as described by the [Harry Benjamin]

Standards of Care." *Id.*, Exhibit B, p. 3-4.

Dr. Taylor also stated that "[d]espite [Plaintiff's]regular contact with mental health

professionals, it appears that psychotherapy has not been adequately provided in this

correctional setting." *Id.*, Exhibit B, p. 3.  Dr. Taylor asserted that in her expert opinion

"the need for sex hormones is essential to [Plaintiff's] physical and mental health." *Id.*,

Exhibit C, p. 2.  According to Dr. Taylor, female hormones can assist in stabilizing mood,

relieving anxiety, and improving self-esteem, and "[w]ithholding them can have serious

consequences, such as continued depression, suicidal tendencies and self-injury." *Id.*,

Exhibit B, p. 4.  In Dr. Taylor's opinion hormone therapy is "essential to prevent

osteoporosis" and "premature fractures." *Id.*  She believes that testosterone is not a viable

MEMORANDUM DECISION AND ORDER 19

option because it would be a detriment to Plaintiff's psychological well-being and would

potentially place Plaintiff at serious risk of increased depression and suicidality.  *Id.*,

Exhibit C.  "Therefore, estrogen is the only appropriate choice," she concludes.  *Id.*

Dr. Taylor recommended that Plaintiff take a daily dose of 1.25 mg of Premarin, 1

mg of Estradiol, or 0.1 mg of Estinyl. *Id.*  Dr. Taylor characterized this dosage as a low

level of  estrogen sufficient to prevent the risk of osteoporosis and to provide enough

feminizing effects to improve Plaintiff's gender dysphoria without a significant

development of secondary sexual characteristics.  *Id.*  Dr. Taylor described this course of

treatment as an appropriate temporary solution with the long-term treatment providing for

5-10 mg Premarin daily, and 1-5 mg Estradiol or 0.1-0.5 mg Estinyl.  *Id.*

Defendants retained Dr. Lori Kohler for the purpose of reviewing and evaluating

Plaintiff's medical records.  *Affidavit of Lori Kohler, M.D.*, ¶ 6 (Docket No. 156).  Dr.

Kohler reviewed the contents of Plaintiff's medical file and his prison file through

November of 2005, his Presentence Investigation Report, and the transcript of his

deposition.  *Id.*  Dr. Kohler did not personally  interview or examine Plaintiff.

Dr. Kohler is a member of the Harry Benjamin International Gender Dysphoria

Association, and she is a family practice physician experienced in providing primary care

to patients who identify themselves as transgender.  She also acts as a consultant for the

California Department of Correction in providing medical care for transgender inmates.

MEMORANDUM DECISION AND ORDER 20

Dr. Kohler also previously served as a Rule 706 expert[7] for a lawsuit in the District of Idaho filed by an inmate suffering from gender identity disorder.  *See id.*, ¶¶ 1-4.

Dr. Kohler provided an opinion for the Defendants that the "evaluation, care and treatment provided by prison medical personnel to inmate Gammett up to and including the time of his self-castration in October 2005 were appropriate." *Id.*, ¶ 9.  She stated that in light of the patient history Plaintiff provided to the medical providers and the documentation available in his prison records, "the initial assessments by inmate Gammett's medical providers that [he] did not meet the diagnostic criteria for GID were proper . . . ." *Id.*

As to the self-castration event, Dr. Kohler opined:

> Based upon my review of this matter, it is my opinion that inmate Gammett's self-castration incident in October 2005 could not have been reasonably anticipated.  Moreover, Inmate Gammett's self-castration is not conclusive evidence of GID.  Inmate Gammett has a documented history of self-mutilation, as well as impulsive, compulsive, attention seeking behavior.  It is my opinion that Mr. Gammett is used to acting out and has been conditioned to gain attention by such behavior.

*Id.*, ¶ 13.

In regard to estrogen therapy, Dr. Kohler stated that the patient must be mentally stable before commencing such treatment.  She also asserts that she "would not initiate such treatment with a patient such as inmate Gammett, where a diagnosis of GID by the inmate's treating providers has not been reached." *Id.*, ¶¶ 14-15.

---

[7] *See* Fed. R. Evid. 706; *Linda Patricia Thompson v. Dave Paskett, et al.*, Case No. CV00-388-S-BLW.
.

Defendants also retained Anne A. Lawrence, M.D., a member of the Harry Benjamin Association Committee that authored the current version of the Harry Benjamin Standards of Care for Gender Identity Disorders, to render an opinion "regarding whether the inmate met the diagnostic criteria for Gender Identity Disorder (GID) at the time he was evaluated by psychologist Chad Sombke and psychiatrist Ken Khatain in July of 2004." *Affidavit of Anne A. Lawrence*, ¶ 2 (Docket No. 157-2).  Dr. Lawrence reviewed Plaintiff's medical records, prison records, and deposition testimony, but did not personally interview or examine Plaintiff.  Dr. Lawrence concluded that "there is no clear indication that Mr. Gammett met the necessary criteria for a diagnosis of GID in July 2004." *Id.*, ¶ 5.

Sharlene Green, Psy.D., currently provides psychological counseling for Plaintiff at IMSI.  *Affidavit of Sharlene Green, Psy.D.* (Docket No. 154).  Dr. Green has twenty years of experience treating individuals with various sexual disorders, including GID.  *Id.*, ¶ 4.  Since April of 2006, Dr. Green has been Plaintiff's treating psychologist, and has been able to observe and interact with him between three to five hours per week.  *Id.*, ¶ 7.  She concurs with the diagnosis reached by Dr. Sombke that Plaintiff does not have GID, and she does not believe that the diagnosis has changed from the time these medical providers rendered their opinions.  *Id.*, ¶ 9

It is Dr. Green's opinion that "personality dynamics, and not an underlying GID issue, were the driving factors which led inmate Gammett to castrate himself in October of 2005." *Id.*, ¶ 12.  She also states that "inmate Gammett is now psychologically trapped

MEMORANDUM DECISION AND ORDER 22

by his own cognitive distortions as he has removed his genitals.  Psychologically, he must

now balance that act against how he see himself sexually.  That is, he has no choice but to

maintain a belief system that he is female. ”  *Id*.

Dr. Green does not recommend any therapy beyond what Plaintiff is currently

being provided.  Nor does she believe that Plaintiff should receive estrogen therapy.  *Id*.,

¶ 14.

**D.**     **IDOC's Policies for Evaluation and Treatment of Inmates with GID**

In August 2003, the IDOC instituted new policies relating to the diagnosis and

treatment of offenders suffering from GID.  Specifically, IDOC Directive No.

401.06.03.501, entitled "Health Care Services for Offenders with Gender Identity

Disorder," governs the treatment of offenders with GID and defines the parameters of

health care services provided to such offenders.  *Jorjani Affidavit*, Exhibit F (IDOC

Directive No. 401.06.03.501) (Docket No. 135).  The Directive provides that diagnosis of

GID is to be based on the DSM-IV criteria and the Harry Benjamin Standards.  *Id.* at §

05.01.00.

IDOC's protocol further provides that diagnosis of GID must be assigned and/or

approved by the Management and Treatment Committee ("MTC").  *Id.*, Exhibit F at §

05.01.00.  The MTC is required to "conduct an evaluation of each offender considered

and develop and recommend a treatment plan for each offender diagnosed."  *Id*.  The

treatment plan is to address medical, mental health, placement and personal adjustment

needs.  *Id.*  The MTC is to be composed of the medical services manager, the chief

MEMORANDUM DECISION AND ORDER 23

psychiatrist, the chief psychologist, the facility head (i.e., the warden), and other mental health, human services, and security staff. *Id.* The MTC may also consult with "a medical specialist in the treatment of offenders with GID (such as an endocrinologist or psychiatrist)." *Id.* The MTC then forwards its recommendation for treatment and placement of offenders with GID to the Administrative Review Committee ("ARC"). *Id.* at § 05.02.00. The ARC reviews the recommendation of the MTC, and may, at its discretion, consult a medical specialist in the treatment of persons with GID. *Id.* The ARC then submits its recommendation for placement, together with the recommendation of the MTC, to the Director, who has final authority for placement. *Id.*

Plaintiff alleges that Defendants failed to follow the GID directives because Defendants did not convene the MTC to evaluate Plaintiff. Plaintiff also alleges that Defendants did not consult a specialist in GID, nor did they apply the requisite standards of either the DSM-IV or the Harry Benjamin Standards. *Id.*, Exhibit HH.

## E.   Standard of Law Governing Merits of Claim

To prevail on an Eighth Amendment claim regarding prison medical care, Plaintiff must show that prison officials' "acts or omissions [were] sufficiently harmful to evidence deliberate indifference to serious medical needs." *Hudson v. McMillian*, 503 U.S. 1, 8 (1992) (citing *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976)). Deliberate indifference exists when an official knows of and disregards a serious medical condition or when an official is "aware of facts from which the inference could be drawn that a substantial risk of harm exists," and actually draws such an inference. *Farmer v.*

MEMORANDUM DECISION AND ORDER 24

*Brennan,* 511 U.S. 825, 838 (1994).  The deliberate indifference to a substantial risk of

serious harm standard is met if a medical provider acts "recklessly disregarding that risk."

*Id.* at 836.  Mere indifference, medical malpractice, or negligence will not support a cause

of action under the Eighth Amendment.  *Broughton v. Cutter Lab*, 622 F.2d 458, 460 (9th

Cir. 1980).

 To prevail on an Eighth Amendment claim, the plaintiff need not prove a

"complete failure to treat."  *Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989).

Failure to render competent care may also violate the Eighth Amendment.  *Hoptowit v.*

*Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982).  In *Hoptowit*, the Court explained:

> Access to the medical staff has no meaning if the medical staff is not
> competent to deal with the prisoners' problems. The medical staff must be
> competent to examine prisoners and diagnose illnesses. It must be able to
> treat medical problems or to refer prisoners to others who can. Such
> referrals may be to other physicians within the prison, or to physicians or
> facilities outside the prison.

*Id*. at 1253.  The *Hoptowit* Court emphasized that "[t]hese requirements apply to physical,

dental, and mental health."  *Id.*

 Differences in judgment between medical providers regarding appropriate medical

diagnosis and treatment are not enough to establish a deliberate indifference claim.  *See*

*Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). "To prevail on a claim involving

choices between alternative courses of treatment, a prisoner must show that the chosen

course of treatment 'was medically unacceptable under the circumstances,' and was

chosen 'in conscious disregard of an excessive risk to [the prisoner's] health.' *Toguchi v.*

MEMORANDUM DECISION AND ORDER 25

*Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004).

**F.   Discussion of Whether Plaintiff Has Raised Serious Questions Going to the Merits**

The first part of the preliminary injunction test is whether Plaintiff has raised serious questions going to the merits of the claims at issue.  Defendants argue that Plaintiff has no chance of winning his Eighth Amendment claim for failure to treat GID because his treating physicians have diagnosed him with other mental disorders, have provided medication for those disorders, and have continued to monitor him in the mental health unit of the prison.  As to the issue of whether Plaintiff should have male or female hormone therapy, Defendants argue that Plaintiff does not have a constitutional right to the treatment of his choice.[8]

Plaintiff frames the issues differently -- that, under the circumstances, Defendants' failure to treat his GID and their offer to provide only male hormone therapy are medically unacceptable courses of treatment that have been chosen in conscious disregard of an excessive risk to his health.  The Court finds a probability that Plaintiff can prove the necessary facts at trial to prevail on the narrow issue that *current* medical providers are ignoring Plaintiff's serious medical needs.  In particular, Plaintiff has shown that there is little, if any, evidence in the record to show that Defendants have performed a

---

[8]  Circuit cases of two decades ago generally hold that GID inmates have no constitutional right to estrogen therapy, and that so long as *some* treatment is offered, such as testosterone, the Eighth Amendment standard is met.  *See White v. Farrier*, 849 F.2d 322, 325-27 (8th Cir. 1988); *Meriwether v. Faulkner*, 821 F.2d 408, 411-13 (7th Cir.), *cert. denied*, 484 U.S. 935 (1987); *Supre v. Ricketts*, 792 F.2d 958, 963 (10th Cir. 1986).

MEMORANDUM DECISION AND ORDER 26

comprehensive and meaningful re-evaluation of Plaintiff's condition since the following information has come to their attention: (1) Plaintiff attempted suicide in August 2004 shortly after he was told he did not have GID; (2) he first attempted castration in October 2005; (3) he tried again and succeeded at self-castration several weeks later; (4) Plaintiff's reason for cutting off his testicles was that he felt he is transgender and "could not stand the sight of them [any] more"; (5) Plaintiff tried to change his name to a female name beginning in December 2003, and successfully obtained a legal name change to "Jenniffer Ann Spencer" occurring in October 2006; (6) Plaintiff filed this lawsuit to attempt to obtain treatment for GID; (7) Dr. Richard B. Christensen, an endocrinologist, stated that Plaintiff recounted a "long history of gender dysphoria," and that he took birth control pills approximately one month before his incarceration to try to obtain feminizing effects from the hormones; (8) Plaintiff disclosed additional personal history consistent with a GID diagnosis in his deposition and in evaluations with Dr. Christensen, Dr. Brown, and Dr. Taylor that Plaintiff had not disclosed to Dr. Khatain and Dr. Sombke for their original diagnoses; (9) Plaintiff's apparent mental health stability may arise from his satisfaction with resulting feminizing effects resulting from self-castration and the hope of obtaining relief through litigation; and (10) Dr. Christensen has opined that irreversible bone density loss caused by hypogonadism would likely start to occur one and one-half (1.5) years after self-castration, and Plaintiff is now beyond that date.

Similarly, while Defendants seem to have identified the fact that Plaintiff has a significant mental health issue regarding gender identity or confusion, there is little in the

MEMORANDUM DECISION AND ORDER 27

record to show that they have provided adequate psychotherapy or other counseling to address that issue.  Rather, they seem to have consciously disregarded it.

Gender is an overwhelming feature of a human being's life.  The choice between male hormone therapy and female hormone therapy charts a course for an inmate to develop the characteristics of either a male or a female.  As a result of the significance of the decision about which type of hormone is appropriate for Plaintiff and the lack of mental health treatment that has been provided to Plaintiff to help him make this decision, the Court finds that Plaintiff has a fair chance of prevailing on his claim that psychotherapy is necessary.

The Court finds a probability that Plaintiff can prove the necessary facts at trial to prevail on the narrow issue that Defendants have been deliberately indifferent to his need for psychotherapy on his significant gender issues after the self-castration.  In particular, the record shows the following.

Plaintiff has individual therapy sessions with Dr. Green, but such therapy is not aimed at helping determine whether Plaintiff has GID or what type of hormone treatment is appropriate for Plaintiff in light of the castration.  Dr. Green notes that "[Gammett] is] [v]ery careful not to mention anything about [the] pending lawsuit." *Sharlene Green Affidavit*, Exhibit A, p. 22 (Docket No. 154).  Another note from September 12, 2006 (post-castration), states that Dr. Green "[e]xplained again that he is not GID and as such - plan focuses on prison adjustment." *Id*., p. 24.  The CMS Treatment Plan from September 13, 2006, signed by Dr. Green states that a treatment goal is to "[k]eep GID issues out of

MEMORANDUM DECISION AND ORDER 28

the groups."  *Id.* at 26.

Dr. Green is of the opinion that

Gammett is now psychologically trapped by his own cognitive distortions as he has removed his genitals.  Psychologically, he must now balance that act against how he sees himself sexually.  That is, he has no choice but to maintain a belief system that he is female.

*Dr. Green Affidavit,* ¶ 12 (Docket No. 154).  However, it does not appear from Dr. Green's notes that Plaintiff has been offered any specific psychological counseling regarding Plaintiff's significant gender identity issues.[9]  Rather, Dr. Green encouraged Plaintiff to continue art therapy.   In July 2004, Dr. Sombke had opined that Plaintiff "may benefit from some education and/or counseling regarding his sexual orientation issues," see *Dr. Sombke Affidavit*, Exhibit C (Docket No. 153), and yet the record shows a surprising lack of education, counseling, or therapy on these highly important gender identity issues, especially after the self-castration.

In *Phillips v. Michigan Dept. of Corrections*, 731 F.Supp. 792 (D. Mich. 1990), where medical providers agreed that Plaintiff had a gender disorder, but disagreed as to the type, the Court granted a preliminary injunction ordering prison officials to provide the movant with estrogen therapy:

For the purposes of this preliminary injunction motion, I believe that plaintiff has shown a strong likelihood of success on the merits. Under the

---

[9] Dr. Brown notes in his report:  [G]ender dysphoria is a set of symptoms that include irritability, anxiety, and depression, sometimes accompanied by suicidal thinking and/or behavior.  It is not a diagnosis.  Even in the absence of a formal diagnosis of GID, the symptom complex of gender dysphoria should still be addressed in any comprehensive treatment plan. *Jorjani Affidavit*, Exhibit D, p. 9 (Docket No. 136).

MEMORANDUM DECISION AND ORDER 29

facts before me on this motion, I find first that plaintiff suffers from a serious medical need, being deprived of treatment, whether the diagnosis is transsexualism or the gender identity disorder of adolescence or adulthood, non-transsexual type. The medical experts on gender agreed that Marty Phillips is gender dysphoric, and Dr. Dickey testified that transsexualism and GIDAANT were closely related disorders. The essence of both disorders result in a human who experiences distress about one of the most striking parts of our identity-whether we are male or female. The medical testimony was clear that transsexualism and GIDAANT are serious psychiatric disorders with profound emotional and physical effects.

*Id*. at 800.

Similarly, here, the Court finds and concludes that whether Plaintiff has "Sexual Disorder Not Otherwise Specified (Dr. Sombke's diagnosis, with concurrence by Dr. Khatain), GID (Dr. Brown's diagnosis), or lack of a "choice but to maintain a belief system that he is female" (Dr. Green's opinion), Plaintiff has shown that he has a fair chance of success on the merits of his claim that, by not offering education or counseling post-castration, Defendants have chosen a course of treatment that is medically unacceptable under the circumstances and have done so in conscious disregard of an excessive risk to Plaintiff's health.

**G.     Whether Plaintiff Has Shown that the Balance of Hardships Tips Sharply in Plaintiff's Favor**

The next part of the test is whether Plaintiff has brought forward sufficient evidence showing that the balance of hardships tips sharply in his favor.  It is undisputed that male hormones will reverse the feminizing effects of Plaintiff's self-castration.  The stated object of Plaintiff's self-castration was to relieve the mental distress caused by his male genitals.  Plaintiff has submitted the testimony of Dr. Brown that testosterone

MEMORANDUM DECISION AND ORDER 30

therapy would be affirmatively harmful to Plaintiff:

> It cannot be over-emphasized that testosterone is contraindicated in a natal male with severe GID.  It is more likely than not that the administration of intramuscular testosterone in this inmate would lead to increased gender dysphoria, desperateness, depression and suicidality, with a high degree of medical certainty.

*Jorjani Affidavit*, Exhibit D, pp. 21-22 (Docket No. 136).  Dr. Brown has also opined that estrogen therapy has "therapeutic benefits beyond the physical manifestations of the hormone effect," and will provide "mood stability," "a decrease in mental health illness," relief from "anxiety," and "improved self-esteem."  *Id.*, Exhibit B, p. 4.

In contrast, Defendants have submitted no report or analysis showing that they have determined what the psychological and emotional impact testosterone treatment or estrogen treatment would have on Plaintiff.  In the face of no submission of this kind by Defendants, Plaintiff has met the burden to show that the balance of hardships tips sharply in Plaintiff's favor.

GID, left untreated, is a life-threatening mental health condition.  As an adolescent, Plaintiff inserted a large needle into his penis, and as a young adult, he attempted to commit suicide after Plaintiff was told that IDOC medical providers did not believe he had GID.  Thereafter, Plaintiff attempted to cut off his testicles, and then successfully performed self-castration while in prison.  Plaintiff told Dr. Brown that Plaintiff's suicide attempts in prison were related to hopelessness in obtaining GID treatment, sometimes combined with other stressors.  Plaintiff is confident he can commit suicide at the prison if properly planned.  *Jorjani Affidavit*, Exhibit D, pp. 11-12 (Docket No. 136).  Dr. Brown

MEMORANDUM DECISION AND ORDER 31

has opined that "[w]ithholding hormone therapy can lead to continued depression, suicidal ideation, and self-injury." *Id.*, Exhibit B, p. 4.

Dr. Green is aware that there is an additional risk of self-mutilation if Plaintiff's hopes of obtaining treatment for GID are not resolved through litigation. Dr. Green's notes from an individual session with Plaintiff indicate that he had reported to another staff member that his lawyers had quit, and that the staff member had talked to him about the matter "as we want to be certain he is able to handle negative events without self-mutilation." *Id.*, p. 35. Plaintiff also stated in deposition that he has not told his treating doctors that he "contemplate[s] suicide quite a bit." *Deposition of Plaintiff*, p. 314 (Docket No. 158).

Hypgonadism, left untreated, leaves Plaintiff at immediate risk of bone density loss and other complications more particularly set forth above. There is no evidence before the Court that female hormones have, in fact, proved harmful to male subjects who are no longer producing testosterone, like Plaintiff, especially when the psychological and mental factors of GID are taken into consideration. Further, the effects of hormone replacement therapy are reversible.

Defendants have not identified any particular harm or loss they would suffer if Plaintiff's Motion is granted. Plaintiff is willing to sign a release accepting the risks of treatment and releasing Defendants from liability for medical malpractice-type claims related to the administration of female hormones. Plaintiff is willing to live in administrative segregation indefinitely if that is what is necessary for prison security

MEMORANDUM DECISION AND ORDER 32

concerns.  Plaintiff will be incarcerated for only another two years, and this litigation may well consume that entire time.  Finally, Defendants are administering female hormones to other inmates in the male incarceration facilities, and, therefore, there is no argument to be made that this cannot be done in Plaintiff's case.

## H.   Conclusion

The Court finds this case analogous to the facts in *Warsoldier*, where the Ninth Circuit determined that a preliminary injunction was appropriate.  There, prison officials continued to punish Warsoldier for failing to cut his hair, even though Warsoldier alleged that his religious beliefs prevented him from cutting his hair.  Prison officials argued that notwithstanding the punishments, Warsoldier was still "free to exercise his religion on all respects."  418 F.3d at 996.  The Ninth Circuit rejected that argument, noting that "[s]uch an argument flies in the face of Supreme Court and Ninth Circuit precedent that clearly hold that punishments to coerce a religious adherent to forgo her or his religious beliefs is an infringement on religious exercise."  *Id*.

Here, similarly, Defendants argue that because they have offered some hormone treatment, albeit harmful hormone treatment under the circumstances, they have met the Eighth Amendment standard.  Plaintiff should be forced to accept male hormones or accept the consequences of having no hormones, they argue.  In light of Plaintiff's significant mental health issues and the lack of a comprehensive and meaningful re-evaluation of Plaintiff after his self-castration, the "choice" offered to Plaintiff is really no choice at all.  Plaintiff has shown a fair chance of prevailing on the merits of a deliberate

MEMORANDUM DECISION AND ORDER 33

indifference claim based on the theory that prison doctors have offered only a medically unacceptable course of treatment post-castration, "in conscious disregard of an excessive risk to [his] health."  *Toguchi v. Chung*, 391 F.3d at 1058.

The Court concludes that, here, as in *Phillips,* "[p]rior to trial, the effects of the lack of estrogen [or here, to provide Plaintiff only with testosterone] will wreak havoc on plaintiff's physical and emotional state.  Such harm is neither compensable nor speculative." 731 F.Supp. at 800.  The Court also concludes that the injunctive relief sought by Plaintiff will enable him to maintain his physical and mental health pending trial of this case.

Based on all of the foregoing, the Court shall grant Plaintiff's Motion for Preliminary Injunction.  While the Eighth Amendment deliberate indifference standard is difficult to meet, Plaintiff has submitted sufficient evidence to meet his burden under the alternative preliminary injunction standard on the narrow issue of whether his current medical treatment is appropriate under the circumstances.  In *Alameda County v. Weinberger*, 520 F.2d 344 (9th Cir. 1975), the Court explained:

> To justify a temporary injunction it is not necessary that the plaintiff's right to a final decision, after a trial, be absolutely certain, wholly without doubt; if the other elements are present (i.e., the balance of hardship tips decidedly toward plaintiff), it will ordinarily be enough that plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation.

*Id*. at 350 n.12.   In other words, "'the greater the relative hardship to [the moving party], the less probability of success must be shown.'"  *Warsoldier v. Woodford*, 418 F.3d 989,

MEMORANDUM DECISION AND ORDER 34

994 (9th Cir. 2005). Plaintiff's evidence meets these standards.

The Court concludes that Plaintiff has raised serious questions going to the merits of the claims, such that a jury could find in Plaintiff's favor that Plaintiff's medical providers were deliberately indifferent to a serious mental health condition. The Court concludes that Plaintiff has a fair chance of prevailing on the merits of his claim that he should have been re-evaluated and should have received appropriate mental health treatment for gender disphoria, GID, and other gender-based psychological issues after the time of his self-castration.

## I.    Remedy

The Court's final task is to determine the relief to be granted for the period of time prior to trial. The Court is aware that injunctive relief should be narrow:

> Injunctive relief against a state agency or official must be no broader than necessary to remedy the constitutional violation. *See Milliken v. Bradley*, 433 U.S. 267, 280, 97 S.Ct. 2749, 2757, 53 L.Ed.2d 745 (1977) (remedy must be related to condition alleged to offend the constitution).
>  . . . .
> In fashioning a remedy for constitutional violations, a federal court must order effective relief. *Smith v. Sullivan*, 611 F.2d 1039, 1044 (5th Cir.1980). Therefore, a federal court may order relief that the Constitution would not of its own force initially require if such relief is necessary to remedy a constitutional violation. *See North Carolina State Board of Education v. Swann*, 402 U.S. 43, 46, 91 S.Ct. 1284, 1286, 28 L.Ed.2d 586 (1971); *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. at 15-16, 91 S.Ct. at 1276.

*Toussaint v. McCarthy*, 801 F.2d 1080, 1087-88 (9th Cir. 1986).

Therefore, the Court shall order Defendants who have responsibility for Plaintiff's current welfare and health care to provide Plaintiff with appropriate female hormone

MEMORANDUM DECISION AND ORDER 35

therapy and psychotherapy to address Plaintiff's gender identity issues, and, where applicable, to comply with IDOC's policies and directives.  Defendants shall notify the Court within ten (10) days of this Order if they are unable to procure a prescription from an Idaho-licensed doctor for the hormone or provide psychotherapy to address Plaintiff's gender identity issues.

## ORDER

NOW THEREFORE IT IS HEREBY ORDERED that Plaintiff's Motion for Preliminary Injunction (Docket No. 134) is GRANTED. Defendants who have responsibility for Plaintiff's current welfare and health care are to provide Plaintiff with appropriate female hormone therapy and psychotherapy to address Plaintiff's gender identity issues, and, where applicable, to comply with IDOC's policies and directives. Defendants shall notify the Court within ten (10) days of this Order if they are unable to procure a prescription from an Idaho-licensed doctor for the hormone or provide psychotherapy to address Plaintiff's gender issues.

IT IS FURTHER HEREBY ORDERED that Defendants' Expedited Motion to Augment Record re: Preliminary Injunction Motion (Docket No. 227) is DENIED.

IT IS FURTHER HEREBY ORDERED that Defendants' Motion for Leave to File Excess Pages (Docket No. 160) is GRANTED.

MEMORANDUM DECISION AND ORDER 36

DATED:  **July 27, 2007**



_____
Honorable Mikel H. Williams
United States Magistrate Judge

MEMORANDUM DECISION AND ORDER 37